UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| VICTORIA WHITTINGTON, MAEGEN BRIGHT, and SONDRA LONESS, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 2:13 CV 16 DDN |
| v. | ) ) | |
| MARK ANTHONY ISGRIG, GEORGE LOMBARDI, and ANGELA PEARL, now known as ANGELA MESMER, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This action is before the court on the motions of defendants Mark Anthony Isgrig (Doc. 93) and George Lombardi and Angela Mesmer (Doc. 95) for summary judgment. The court heard oral argument on May 13, 2015.

## I. PLAINTIFFS' CLAIMS

Following earlier rulings in this case, plaintiffs Victoria Whittington, Maegen Bright, and Sondra Loness, allege that, while when they were sentenced Missouri state prisoners, defendant Isgrig, then a Missouri state correctional officer, intentionally and improperly touched their breasts for his sexual gratification when he conducted pat down procedures in the Missouri State Women's Eastern Reception, Diagnostic and Correctional Center (WRDC). Plaintiffs seek relief against Isgrig and two officials of the Missouri Department of Corrections, defendants Lombardi and Mesmer.

Before the court are plaintiffs' claims for relief against all three defendants in their individual capacities under the Eighth Amendment to the United States Constitution and under Missouri state common law:

(1) Counts 1, 8, and 16 allege against defendant Isgrig a violation of plaintiffs' Eighth Amendment right against cruel and unusual punishment;

(2) Counts 2, 9, and 17 allege against defendant Isgrig the Missouri common law tort of outrageous conduct;

(3) Counts 3, 10, and 18 allege against defendants Isgrig and Lombardi claims under the Eighth Amendment for a failure to train ;

(4) Counts 4, 11, and 19 allege against defendants Lombardi and Mesmer a claim under the Eighth Amendment for their failure to protect plaintiffs out of deliberate indifference;

(5) Counts 5, 12, and 20, allege against all defendants a claim under the Eighth Amendment for a failure to protect out of gross negligence or reckless indifference;

(6) Counts 6, 13, and 21, allege against defendants Lombardi and Mesmer a claim under the Eighth Amendment for the deliberate failure to use adequate procedures; and,

(7) Counts 7, 14, and 22, allege against defendants Lombardi and Mesmer a claim under the Eighth Amendment for a failure to use adequate procedures out of reckless indifference or gross negligence.

Plaintiffs seek substantial actual damages, punitive damages, attorney fees, and costs.

## II. SUMMARY JUDGMENT STANDARD

Courts must grant summary judgment when the pleadings and the proffered evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a

rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."
Scott v. Harris, 550 U.S. 372, 381 (2007) (internal citation omitted). A fact is "material" if it could affect the ultimate disposition of the case, and a factual dispute is "genuine" if there is substantial evidence to support a reasonable jury verdict in favor of the nonmoving party. Rademacher v. HBE Corp., 645 F.3d 1005, 1010 (8th Cir. 2011). Stated another way, the party defending the motion must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences. Scott, 550 U.S. at 379. The nonmoving party must proffer "affirmative evidence in order to defeat a properly supported motion for summary judgement." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986); Iverson v. Johnson Gas Appliance Co., 172 F.3d 524, 530 (8th Cir. 1999). If the nonmoving party fails to proffer substantial evidence of an essential element of a claim, summary judgement is appropriate on that claim because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323; St. Jude Med., Inc. v. Lifecare Intern., Inc., 250 F.3d 587, 595 (8th Cir. 2001).

### III. FACTUAL BACKGROUND[1]

The proffered evidence submitted on the motions for summary judgment indicates that the following facts are without genuine dispute.

Defendant Mark Isgrig was employed by the Missouri Department of Corrections (MDOC) as a Correctional Officer I at the Women's Reception and Diagnostic Center (WRDC). (Doc. 94-2 at 8.) Rachel Henke is a Correctional Officer II at WRDC and was defendant Isgrig's direct supervisor. (Doc. 96-10 at 8.) Defendant Angela Mesmer is the warden at WRDC. (Doc. 96-6 at 6.) Defendant George Lombardi is MDOC's Director.

---

[1] All document references are to the court's CM/ECF document number and attachment number.

(Doc. 96-7 at ¶ 2.)  Joey E. Runyan is an investigator in District 1 of MDOC, which includes WRDC.  (Doc. 96-8 at 11.)

Correctional officers are trained on pat down procedures in basic training when they begin their employment.  (Docs. 96-6 at 10; 96-9 at 7, 9; 96-10 at 8–9.)  Defendant Isgrig received training on proper pat down procedures when he started working at MDOC in 2005 or 2006.  (Doc. 96-6 at 10.)  Isgrig's last frisk search training was in November 2010.  (Doc. 100-1 at 10.)  There are policy books, which include the procedures for proper pat down searches in the training rooms, control centers, shift supervisors offices, and on the computers where corrections officers can review them.  (Docs. 96-6 at 11; 100-1 at 8.)

The proper pat down procedure of a female offender is for a male or female correctional officer to stand behind and reach around her.  (Docs. 96-5 at 17–18; 96-8 at 15–16; 96-9 at 10–11; 96-10 at 11–13, 25–26.)  The thumb of each hand of the officer is folded in and the hand, thumb in, is placed between the offender's breasts.  (Docs. 96-5 at 17–18; 96-8 at 15–16; 96-9 at 10–11; 96-10 at 11–13, 25–26.)  The officer's hand then goes under the contour of the bra line, palm side down.  (Docs. 96-5 at 17–18; 96-8 at 15–16; 96-9 at 10–11; 96-10 at 11–13, 25–26.)  The back of the hand then goes across the top of the breast.  (Docs. 96-5 at 17–18; 96-8 at 15–16; 96-9 at 10–11; 96-10 at 11–13, 25–26.)  Officers should only use the backs of their hands, and the palm should never touch an offender's breast.  (Docs. 96-5 at 17–18; 96-8 at 15–16; 96-9 at 10–11; 96-10 at 11–13, 25–26.)  If an offender is ever uncomfortable with any male correctional officer performing a pat down search, she may ask for a female correctional officer to perform the search instead.  (Docs. 96-5 at 21; 96-10 at 23.)

Defendant Lombardi does not have any personal involvement in the day-to-day operations at WRDC and he had no direct responsibility to train or supervise Mesmer or Isgrig.  (Doc. 96-7 ¶¶ 5–6.)  Lombardi does not personally conduct training or develop training programs, classes, or policies.  (Id.)  He had no knowledge of improper pat down searches at WRDC by Isgrig or any other correctional officer.  (Id at ¶¶ 4, 7.)

Plaintiff Victoria Whittington was incarcerated at WRDC from December 26, 2010 to March 24, 2013. (Doc. 94-3 at 9.) Defendant Isgrig fondled Whittington two times. (Id. at 19–20.) Also he performed pat down searches on her more often than other inmates. (Id.) Isgrig performed these searches in areas not visible to cameras or other officers. (Docs. 94-2 at 20; 100-1 at 6.) One fondling occurred in April 2011. (Doc. 94-3 at 29.) Whittington complained to Corrections Officer Ames and he informed Whittington that she could file a grievance. (Id. at 29–30.) Whittington did not file a grievance at that time. (Id. at 30.) MDOC investigator Runyan questioned Whittington regarding defendant Isgrig in June 2011. (Id. at 32.) Whittington and other offenders would pose sexually in their rooms when Isgrig came, in order to excite and cause him to become flustered, because they found his reactions funny. (Doc. 100-1 at 6.) Whittington did not seek medical or psychological treatment as a result of Isgrig's assaults on her. (Doc. 94-8 at 7.) Whittington feels scared, humiliated, embarrassed, and violated due to the actions of Isgrig. (Id. at 6.) Whittington also experiences insomnia and a fear of all correctional officers. (Id.)

Plaintiff Maegen Bright was incarcerated at WRDC from some time in December 2010 to April 29, 2013, and again from April 22, 2014 to the present. (Doc. 94-4 at 7–8.) Bright was frisked by Isgrig between 25 and 50 times, and inappropriately two or three times. (Id. at 18.) During these inappropriate pat down searches Isgrig used his hands, palms up, and grabbed Bright's breasts. (Id.) Bright complained to Corrections Officer Ames. (Doc. 94-7 at 5.) Bright also discussed the matter with MDOC Investigator Runyan. (Docs. 94-7 at 6; 100-1 at 11–12.) She never sought medical or psychological treatment as a result of Isgrig's assaults on her. (Docs. 94-4 at 34; 94-7 at 7–8.) Bright felt shocked, angry, uncomfortable, embarrassed, and ashamed after Isgrig fondled her. (Docs. 94-4 at 34; 94-7 at 6–7.) Bright also feels anxiety whenever a corrections officer approaches her. (Doc. 94-7 at 6.)

Plaintiff Sondra Loness was incarcerated at WRDC from January 18, 2011 to July 28, 2011; from June 12, 2013 to August 6, 2014; and again from January 16, 2015 to the present. (Doc. 94-5 at 7–8.) Loness was frisked by Isgrig frequently and all of the

searches were inappropriate. (Doc. 94-5 at 16–17, 19; 94-7 at 7.) Isgrig searched Loness in locations that could not be observed by other corrections officers. (Doc. 94-7 at 7.) Loness discussed the matter with MDOC Investigator Runyan. (Id.) Loness never sought treatment or psychological counseling as a result of these assaults, but did seek it due to trauma experienced during her childhood. (Doc. 94-6 at 8.) Loness is in constant emotional distress from the assaults by Isgrig. (Id.) Loness feels shame, humiliation, and anxiety as a result of these assaults. (Id.) She sometimes has panic attacks due to Isgrig's fondling of her. (Id.)

On or about April 6, 2011, inmate L.B.[2] complained to a prison chaplain regarding an officer performing improper pat down searches, but she did not identify the officer by name. (Docs. 96-5 at 25; 96-8 at 22; 100-1 at 2.) L.B. stated that the officer stared at her breasts, buttocks, and genitals and then groped her breasts on April 6, 2011. (Doc. 100-1 at 2). Sometime between April 6 and 12, 2011, L.B. wrote a letter to the warden, defendant Angela Mesmer, complaining of lewd and inappropriate behavior by an unidentified corrections officer. (Id.) L.B. was immediately moved, at her request, to administrative segregation and was transferred to a different prison on April 19, 2011. (Docs. 96-5 at 32; 96-6 at 21–22; 96-8 at 121.) On April 7, 2011, an interoffice memorandum was sent by the prison chaplain to the deputy warden documenting L.B.'s complaint regarding an unidentified corrections officer. (Doc. 96-6 at 17–18.) On April 8, 2011, Mesmer ordered an investigation of the allegations of improper pat down searches. (Docs. 96-5 at 26, 30; 96-6 at 16.)

On April 12, 2011, MDOC Investigator Runyan began his investigation by reviewing the complaint letter L.B. sent to the warden's office regarding inappropriate behavior by an unidentified officer. On April 18, 2011, Runyan interviewed L.B., who gave him a general description of the offending officer. (Doc. 100-1 at 3.) Runyan then reviewed the time logs and surveillance tapes from April 6, 2011 and matched L.B.'s description with Isgrig. (Docs. 96-8 at 23; 100-1 at 3.)

---

[2] Inmates who are asserted to be sexual assault victims and are not parties to this suit are identified by their initials only.

There was a pause in Runyan's investigation between April 6, 2011 and June 1, 2011. (Docs. 96-5 at 32; 96-8 at 24–25; 100-1 at 3.) During this time Isgrig was still an active corrections officer working in the housing unit. (Docs. 96-5 at 35–36; 96-6 at 34; 96-8 at 25.) Runyan interviewed complaint L.B. before she was transferred. (Doc. 96-8 at 25.) After that interview he returned to investigating his older cases. (Id.)

At the beginning of June 2011, Runyan began interviewing other staff at WRDC. (Doc. 100-1 at 3–4.) On June 6, 2011 Runyan interviewed L.B.'s former cellmates who did not confirm L.B.'s accusations. (Id. at 4.) Runyan, however, was provided another possible victim's name by a cleaning porter at the prison. (Id.) Offender M.G. provided Runyan with a written statement regarding Isgrig's actions. (Id. at 4–5.) Isgrig ogled her breasts, used a palms upward technique to search around her breasts, and then lifted and squeezed her breasts. (Id. at 5.) M.G. believed that Isgrig had an obsession with large-breasted women. (Id. at 5.) M.G. provided additional victims' names: M.L., V.B., and Victoria Whittington. (Id.) Neither M.L. nor V.B. accused Isgrig of acting improperly. (Id. at 6, 8.) Victoria Whittington, however, allowed Runyan to conduct a recorded audio interview regarding Isgrig's behavior. (Docs. 94-2 at 32; 94-8 at 3–5; 100-1 at 6.) Her description of his actions is detailed above. Whittington also provided Runyan with the names of other possible victims: B.V. and Sondra Loness. (Doc 100-1 at 6.) Runyan interviewed Loness who described the same actions by Isgrig: frisking out of view of other officers or surveillance cameras, excessive searches, targeting Caucasian large-breasted women. Loness could not remember at that time if Isgrig patted her down palms up or palms down. (Id. at 7.) All offenders who cooperated with Runyan stated it was common knowledge among the inmate population in Housing Unit 2 that Isgrig was performing improper searches for his own pleasure. (Id. at 3–8, 11–12.)

On June 13, 2011, Runyan set up a covert camera to document Isgrig's searches. (Id. at 9.) On June 14, 2011, Runyan observed Isgrig perform fourteen female offender frisk searches, and noted the following details: only Caucasians were searched, all offenders appeared mid-30s or younger, most offenders could be described as full-figured, and all searches were done in contradiction to policy. (Id.) On June 16, 2014,

Runyan asked Sergeant Hendren to observe Isgrig conduct searches from a location where Isgrig could see him but would not suspect he was being surveilled. (Id.) All searches during this time were performed on female African American offenders without incident. (Id.) Sergeant Hendren then observed Isgrig covertly. (Id.) These searches were conducted on approximately 10–15 offenders. All female offenders were Caucasian and Isgrig did not follow MDOC proper frisk procedures. (Id.) In one case Isgrig ran his hand alongside the breast of an offender. (Id.) All offenders looked disgusted with Isgrig's actions. (Id.). Sergeant Hendren stated, "[i]n conclusion, it appears to me that CO I Isgrig knows how to perform a proper frisk search on a female offender; however, at times, he chooses not to in order to gain some form of personal gratification, whether that be sexual in nature or another form of control over the female offender." (Id.)

On June 20, 2011, Runyan interviewed Isgrig. (Id. at 9–10.) This interview was audio recorded and Isgrig provided a written statement. (Id. at 9, 11.) Isgrig stated he never conducts improper pat downs and that he has never had a formal complaint against him regarding improper pat downs. (Id. at 10.) He claimed that he stayed away from searching large breasted women because "I have to lean around and make sure I hit the right places." (Id.) He stated that, if an offender was complaining he went over the top of the breasts, "that is not true" and "[n]ow, I know that would be strictly wrong." (Id. at 10–11.) Isgrig also denied that he was getting any kind of gratification from searching offenders. (Id. at 10–11).

On June 21, 2011, Runyan conducted an audio recorded interview with victim offender M.B. (Id. at 11.) M.B. stated that Isgrig does his searches in a location different from other guards. Until recently M.B. did not realize that Isgrig's searches were improper. (Id.) On or about June 9, 2011, M.B. spoke with Maegan Bright who described how Isgrig was searching her and was very upset by it. (Id.) M.B. realized the searches were improper and she contacted Corrections Officer Ames. (Id.) M.B. was referred to Beverly Little, the Functional Unit Manager. (Id.) M.B. stated Isgrig would bump her genital area with his hands as he worked his way up her leg from the knee.

(Id.) Then he would put his hands, palms up, cupping her breasts and lift them high. (Id.) M.B. stated she was unaware of an investigation of Isgrig. (Id.)

On June 22, 2011, Runyan conducted an audio recorded interview with victim offender Maegan Bright. (Id.) Bright also provided a written statement. (Id.) She stated Isgrig put both hands around her breasts, palms-up and lifted them very high simultaneously. (Id. at 12.) Other offenders in her housing wing complained of the same actions by Isgrig and Bright complained to M.B. (Id.) Bright provided another possible victim's name: M.P. (Id.)

On June 22, 2011, Runyan conducted an audio recorded interview with M.P. (Id.) She would not cooperate because she did not want to become involved in an investigation so close to her upcoming parole hearing. (Id.) She stated that, if Isgrig attempted to search her again though, she intended to refuse. (Id.)

On June 27, 2011, Runyan conducted a second audio recorded interview with Isgrig. (Id.) Runyan advised Isgrig that new evidence was obtained and that this now was a criminal investigation. (Id. at 13.) Runyan informed Isgrig that by policy he is not required to make any statements that might incriminate him. (Id.) Isgrig agreed to answer questions. (Id.) Isgrig was informed of the specific complaints by M.B. and Bright. Isgrig was "shocked" that those inmates would accuse him because they were both "good offenders." (Id.) Isgrig denied all claims. (Id.) Runyan showed him the video of his improper searches. (Id.) Isgrig's explanation was that he was doing "sloppy searching" but stated he had no "criminal intent." (Id.) Isgrig provided a written statement. (Id.)

Shortly after June 27, 2011, Mesmer transferred Isgrig from duties inside the Housing Unit to a location where he had no contact with offenders. (Docs. 96-5 at 35; 96-6 at 34.) Thereafter, Isgrig never performed any more searches of inmates at WRDC. (Doc. 96-6 at 114–15.) Shortly after this reassignment, Isgrig was transferred to Northeast Correctional Center (NECC) which houses only male inmates. (Docs. 96-5 at 34–35; 96-6 at 34–35.)

WRDC officials received two official complaints about Isgrig's searches: one from M.B. and one from L.B. (Docs. 96-5 at 32, 49–50; 96-6 at 21–22; 96-8 at 120–21; 96-9 at 15–16.)

On July 20, 2011, Mesmer conducted a pre-disciplinary meeting with Isgrig. (Docs. 96-5 at 36; 96-6 at 37.) On August 1, 2011, Mesmer requested disciplinary action for Isgrig. (Doc. 96-6 at 54, 58.)

On August 10, 2011, Runyan filed probable cause affidavits with the Audrain County Prosecutor stating there is probable cause to believe that Isgrig had committed sexual misconduct, first degree, under Rev. Mo. Stat. 566.090. (Docs. 100-2; 100-3; 100-4.)

On January 21, 2012, Isgrig pled guilty to two counts of third degree assault. State v. Isgrig, 11AU-CR00560-01.[3] He was sentenced to fifteen days in the county jail, but that was suspended and he was placed on two years of supervised probation and ordered to perform 100 hours community service. Id.

On January 31, 2012, Mesmer requested another pre-disciplinary meeting with Isgrig, which was scheduled for February 6, 2012. (Doc. 96-6 at 79–81.) On January 31, 2012, Isgrig was placed on administrative leave which lasted until his termination on April 13, 2012. (Docs. 96-6 at 82, 92.) A letter from MDOC dated April 3, 2012, detailing the reasons for his termination was sent to Isgrig. (Doc. 100-5.) It stated his actions "constitute disgraceful conduct that brought the state service into public disrepute" and that his actions were in violation of MDOC policies and procedures. (Doc. 100-5 at 1–2.)

---

[3] The court takes judicial notice of defendant Isgrig's guilty plea from Case.net, http://www.courts.mo.gov/casenet/.

## IV.  DISCUSSION

A. **Missouri State Law Claims of Outrageous Conduct (Counts 2, 9, 17)**

Plaintiffs allege claims of outrageous conduct, under Missouri state tort law, against only defendant Isgrig.  Isgrig argues that plaintiffs fail to satisfy the requisite level of resulting severe emotional distress.

In order to prove a claim of outrageous conduct under Missouri law, the plaintiff must prove:  (1) defendant's conduct was extreme and outrageous; (2) defendant acted in an intentional or reckless manner; and (3) defendant caused the plaintiff severe emotional distress.  See Hanks v. Gen. Motors Corp., 859 F.2d 67, 69 (8th Cir. 1988) (citing LaBrier v. Anheuser Ford, Inc., 612 S.W.2d 790, 793 (Mo. 1981)); accord Bass v. Nooney, 646 S.W.2d 765, 772–73 (Mo. 1983) (abrogating requirement of a contemporaneous physical injury).  The parties do not dispute whether there has been proffered substantial evidence that Isgrig's conduct was extreme and outrageous or whether it was intentional or reckless.  (Docs. 94, 100.)

"It is for the court to determine, in the first instance whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery."  Frye v. CBS, Inc., 671 S.W.2d 316, 319 (Mo. Ct. App. 1984).  "If, after drawing all reasonable inferences in favor of the claimant, the court finds that the question of extreme and outrageous conduct is reasonably debatable, the issue should go to the jury."  Princess House, Inc. v. Lindsey, 918 F. Supp. 1356, 1372 (W.D. Mo. 1994) (quoting Frye, 671 S.W.2d at 319).  In this case, that issue will be presented to the jury.

The parties dispute whether plaintiffs' injuries are legally sufficient to sustain verdicts in their favor.  Although some proof of a diagnosable injury is required, medically documented injuries, either physical or emotional, are not required for intentional emotional torts.  Bogan v. Gen. Motors Corp., 500 F.3d 828, 832 (citing State ex rel. Dean v. Cunningham, 182 S.W.3d 561, 566 n.4 (Mo. 2006) (en banc)).  The harm must be both medically significant and diagnosable.  Bass, 646 S.W.2d at 772–73.  Further, it is not necessary that the emotional distress manifests itself as a physical injury.  Id.; Restatement (Third) of Torts § 46 cmt. g, 1 (2012).  This requirement of an "impact

injury" was abrogated in Bass. 646 S.W.2d at 769–73. "Severe harm must be proved, but in many cases the extreme and outrageous character of the defendant's conduct is itself important evidence bearing on whether the requisite degree of harm resulted[.]" Anthan v. Prof'l Air Traffic Controllers Org., 672 F.2d 706, 710–11 (8th Cir. 1982) (quoting Restatement (Third) of Torts § 46 cmt. j).

Plaintiffs have reported the following symptoms. Whittington feels scared and offended, is unable to sleep, and has nightmares. (Doc. 94-8 at 5–7). Plaintiff Bright feels humiliation, shock, anxiety, and apprehension around corrections officers. (Docs. 94-4 at 34; 94-7 at 6–7.) Plaintiff Loness describes her symptoms as shame, humiliation, and anxiety resulting in panic attacks. (Docs. 94-1 ¶ 21; 94-6 at 7–8.) Although defendant argues that these symptoms are not sufficient to meet Missouri's threshold for liability, reasonable jurors could disagree. It is up to a jury to decide whether these symptoms qualify as severe emotional distress under Missouri law.

Therefore, defendant Isgrig's motion for summary judgment as to Counts 2, 9, and 17 is denied.

## B. Eighth Amendment Claim for Failure to Train (Counts 3, 10, 18)

### Defendant Isgrig

Plaintiffs allege that defendant Isgrig was not trained properly and therefore could not properly execute his duties as a corrections officer. Plaintiffs also allege that defendants did not retrain staff after prior incidents of deviant sexual conduct, which resulted in the violation of plaintiffs' civil rights.

Defendant Isgrig argues that he cannot be held to have improperly trained himself and that liability for failure to train an officer lies, if at all, with the government or municipality. (Id.) To succeed on this claim, plaintiffs must prove that, "(1) the [prison's] . . . training practices [were] inadequate; (2) the [prison] was deliberately indifferent to the rights of others in adopting them, such that the 'failure to train reflects a deliberate or conscious choice by [the prison]'; and (3) an alleged deficiency in the . . .

training procedures actually caused the plaintiff's injury." Parrish v. Ball, 594 F.3d 993, 997 (8th Cir. 2010) (quoting Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996)).

The evidence presented in defendant Isgrig's motion for summary judgment shows that Isgrig was not responsible for training correctional officers, let alone himself. Officers, including Isgrig, receive pat down training in basic training. (Doc. 96-6 at 10; 96-9 at 9). All officers also have a minimum annual training requirement imposed by the Department of Corrections. (Doc. 96-9 at 7.) There are policy books in the training rooms, control rooms, and the shift supervisors' offices, and on the prison computers for officers to review at any time. (Doc. 96-10 at 11.) Additionally, no evidence has been proffered that shows that defendant Isgrig was responsible for training anyone.

Therefore, his motion for summary judgment as to Counts 3, 10, and 18 for failure to train is sustained.

Defendant Mesmer

In order to find a supervisor liable for a subordinate's failure to train, plaintiffs must show, "(1) the [prison's] . . . training practices [were] inadequate; (2) the [prison] was deliberately indifferent to the rights of others in adopting them, such that the 'failure to train reflects a deliberate or conscious choice by [the prison]'; and (3) an alleged deficiency in the . . . training procedures actually caused the plaintiff's injury." Parrish, 594 F.3d at 999 (quoting Andrews, 98 F.3d at 1076). Supervisor liability cannot be based on the theory of respondeat superior. Tlamka v. Serrell, 244 F.3d 628, 635 (8th Cir. 2001). Plaintiffs must show the supervisor "directly participated in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." Id. (quoting Andrews, 98 F.3d at 1078).

The uncontroverted evidence proffered by defendant Mesmer shows the following. First, all corrections officers undergo pat down training during basic training and annual training. (Doc. 96 at ¶¶ 9, 10.) Second, written policies and procedures include the proper method for pat down searches of offenders. (Doc. 96 at 11.) Finally, these policies and procedures are available in locations throughout the prison. (Id.)

Additionally, Isgrig's supervisor, Sergeant Hendren, concluded that Isgrig knew how to do a proper search of female inmates, but chose not to. (Docs. 96-8 at 90–91; 100-1 at 9.) Defendant Isgrig himself admitted that he knew how to conduct a proper search, but said he was "sloppy" with his search procedures. (Docs. 96-8 at 90–91; 100-1 at 13.)

The plaintiffs have failed to show that the prison's training practices were inadequate or that there was a "deliberate or conscious choice" to not properly train Isgrig.

Therefore, defendant Mesmer's motion for summary judgment as to Counts 3, 10, and 18 is sustained.

## C. Eighth Amendment Claim for Failure to Protect (Counts 4, 11, 19)

Plaintiffs have alleged that defendants Lombardi and Mesmer were deliberately indifferent to the protection of the plaintiffs against the actions of Isgrig, in violation of 42 U.S.C. § 1983. (Doc. 75 7–9, 18–19, 29–30.) Plaintiffs must prove that (1) there was a substantial risk of harm to the plaintiff inmate, and (2) that a prison official knew of the risk, but recklessly disregarded the risk. Farmer v. Brennan, 511 U.S. 825, 834 (1994). It is not enough that the prison official should have perceived the risk; the official must have actually perceived the risk and chose to ignore it. Id. at 837–38.

<u>Defendant Mesmer</u>

Defendant Mesmer argues that she was not deliberately indifferent to plaintiffs' safety regarding possible sexual assault by corrections officers, including Isgrig.

The uncontroverted facts show that upon learning that there was a possibility of a male corrections officer improperly patting down female inmates, Mesmer ordered an investigation. (Docs. 96-5 at 2, 30; 96-6 at 16–18.) Prior to the issue with Isgrig there had been no complaints regarding searches. (Doc. 96-5 at 49–50.) The identity of the corrections officer was unknown until approximately April 18, 2011. (Doc. 100-1 at 3.) As soon as investigator Runyan verified the initial complaint with other inmates and recorded Isgrig performing improper searches, Mesmer removed Isgrig from contact with

the inmate population. (Docs. 96-5 at 35; 96-6 at 34.) Then MDOC removed him from the female prison entirely. (Docs. 96-5 at 34–35; 96-6 at 34–35.) Runyan filed a probable cause statement with the Audrain County prosecutor and Isgrig was charged with sexual misconduct, first degree. (Docs. 100-2; 100-3; 100-4); State v. Isgrig, 11AU-CR00560-01. After Isgrig pled guilty to a lesser charge on January 21, 2012, he was placed on administrated leave and terminated as of April 13, 2012. (Docs. 96-6 at 79–82, 92; 100-5.)

The undisputed record indicates that Mesmer was not deliberately indifferent to the risk posed by Isgrig. Before this incident with Isgrig she had no reason to suspect any corrections officer of sexual assault. Mesmer could not just assume that corrections officers were going to commit sexual assault. See Parish, 594 F.3d at 999 ("[a]n objectively reasonable officer would know that it is impermissible to touch a detainee's sexual organs by forcible compulsion.") Every corrections officer undergoes a yearly background check. (Doc. 96-6 at 90.) After learning of a possible issue, she took immediate steps to identify the suspect and confirm the allegations. See Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000) (even if the risk is known, it is not deliberate indifference if officials reasonably respond) (internal citation omitted). Once confirmed, Isgrig was removed from contact with inmates.

### Defendant Lombardi

Defendant Lombardi argues that he did not have any personal involvement in any of the allegations in the complaint. Therefore, he could not have been deliberately indifferent in protecting plaintiffs from Isgrig.

Although defendant Lombardi has been the MDOC Director since January 2009, he does not have any direct involvement in the day-to-day operations of the prisons. (Doc. 96-7 at 2.) He is not involved in the training of either Isgrig or Mesmer. (Id.) No substantial evidence has been proffered that he could have known of the potential risk posed by Isgrig.

The undisputed evidence presented shows that neither Mesmer nor Lombardi were deliberately indifferent to the risk posed by Isgrig.

Therefore, their motion for summary judgment on Counts 4, 11, and 19 is sustained.

**D.     Eighth Amendment Claim of Failure to Protect (Counts 5, 12, and 20)**

Plaintiffs argue that all defendants acted with reckless indifference and/or gross negligence in failing to protect them from the risk posed by Isgrig. (Doc. 75 at 9–10, 19–20, 30–32.) Defendants counter that the proper standard for this claim is deliberate indifference not reckless indifference and/or gross negligence. (Docs. 94 at 8–9; 96 at 12.)

As previously discussed, in order to prove a section 1983 claim regarding a failure to protect, plaintiffs must show: (1) there was a substantial risk of harm and (2) that a prison official knew of the risk, but recklessly disregarded the risk. Farmer, 511 U.S. at 834. It is not enough that the prison official should have perceived the risk; the official must have actually perceived the risk and chose to ignore it. Id. at 837–38. The prison official has to have a "sufficiently culpable state of mind" of deliberate indifference to the inmate's health or safety. See Id. at 834; Fields v. Abbot, 652 F.3d 886, 894 (8th Cir. 2011) (gross negligence not enough); Davis v. Oregon Cnt'y, Missouri, 601 F.3d 543, 548–49 (8th Cir. 2010).

Therefore, the defendants' motions for summary judgement as to Counts 5, 12, and 20 are sustained.

**E.     Eighth Amendment Claim of Failure to use Adequate Procedures (Counts 6, 13, and 21)**

Plaintiffs argue that the defendants deliberately failed to use adequate procedures, thereby subjecting them to the risk of being exposed to a sexual deviant. (Doc. 75 at 10–12, 21–22, 32–33.) Plaintiffs also argue that there were inadequate procedures in place to prevent the alleged assault. Defendants argue that these claims merely restate Counts 3,

4, 10, 11, 18, and 19.  In the alternative defendants argue that there is no constitutional right to certain procedures and prison policies.  (Doc. 96 at 12–13.)

The undisputed evidence shows that the prison had adequate training procedures in place.  The administrative process to discipline and remove correctional officers who have violated policies is also adequate.  There has been no evidence proffered that either Mesmer or Lombardi was deliberately indifferent to plaintiffs' health and safety by either not having or not enforcing adequate training and administrative procedures.

Therefore, the defendants' motion for summary judgment with regards to Counts 6, 13, and 21 is sustained.

### F.  Eighth Amendment Claim of Failure to use Adequate Procedures with Reckless Indifference and/or Gross Negligence (Counts 7, 14, and 22)

Plaintiffs argue that all defendants acted with reckless indifference and/or gross negligence in failing to use adequate procedures regarding pat downs of female prisoners by male corrections officers.  (Doc. 75 at 12–14, 22–24, 33–35.)  Defendants argue that there is no constitutional right to have certain procedures.  (Docs. 94 at 8–9; 96 at 12.)

The standard for section 1983 claims, even those involving safety measures, is deliberate indifference, not any form of negligence.  See Davis, 601 F.3d at 548–49 (fire precautions and procedures evaluated under a deliberate indifference standard).  There is no constitutional entitlement to a specific correctional procedure, absent deliberate indifference by a defendant.

Therefore, defendants' motion for summary judgment with regards to Counts 7, 14, and 22 is sustained.

### G.  Defendant Lombardi and Mesmer's Qualified Immunity

In the alternative both defendants Lombardi and Mesmer argue that they are protected from suit under qualified immunity.  (Doc. 96 at 13.)  Defendants argue that they are shielded if they have performed their duties reasonably.  (Id.).

"Qualified immunity protects a government official from liability in a section 1983 action unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." Henderson v. Munn, 439 F.3d 497, 501 (8th Cir. 2006.) Qualified immunity is a two-part test:

1) Whether, after viewing the facts in the light most favorable to the party asserting the injury, there was a deprivation of a constitutional or statutory right; and if so

2) whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted.

Henderson, 439 F.3d at 501–02.

An official is liable for violating bright lines regarding constitutional rights. Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004). If either part of the test is answered in the negative, then the official is entitled to qualified immunity. Saucier v. Katz, 533 U.S. 194, 2011 (2001). It is up to the court to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

The court will address only the first prong of the qualified immunity test, because Mesmer and Lombardi's actions did not amount to the violation of clearly established constitutional right. See Parrish, 594 F.3d at 1001. In order for either Mesmer or Lombardi to have violated plaintiffs' constitutional rights by failing to supervise Isgrig, plaintiffs must show Mesmer and Lombardi: (1) received notice of a pattern of unconstitutional acts committed by subordinates; (2) demonstrated deliberate indifference to or tacit authorization of the offensive acts; (3) failed to take sufficient remedial action; and; (4) that such failure proximately causes injury to [plaintiffs]. Parrish, 594 F.3d at 1002.

The uncontroverted facts show that Mesmer did not know of the issue regarding Isgrig until April 2011. (Docs. 96-5 at 25–26; 96-8 at 22–23; 100-1 at 2–3.) Prison officials only received two official complaints regarding Isgrig: L.B.'s complaint that

initiated the investigation and M.B's during the investigation. (Docs. 96-5 at 32, 49–50; 96-6 at 21–22; 96-8 at 102–21; 96-9 at 15–16.) After identifying Isgrig and confirming the initial complaint Mesmer removed Isgrig from contact with female inmates. (Docs. 96-5 at 34–35; 96-6 at 34–35, 111–15.) At no time was Lombardi involved in the training, supervision, or discipline of Isgrig or Mesmer. (Doc 96-7 ¶¶ 5–6).

In order for either Mesmer or Lombardi to have violated plaintiffs' Eighth Amendment constitutional rights by failing to train Isgrig, the lack of training must amount to deliberate indifference. No evidence indicated that Mesmer was indifferent to Isgrig's training. He was trained during basic training, annual training, and had access to the policies and procedures regarding pat down searches at all times during his employment. (Docs. 96-6 at 10–11; 96-9 at 7, 9; 96-10 at 8–9; 100-1 at 8, 10.) At no time was Lombardi involved in the training, supervision, or discipline of Isgrig or Mesmer. (Doc 96-7 ¶¶ 5–6).

Therefore, even if summary judgment was not appropriate regarding the claims against defendants Mesmer and Lombardi, both are entitled to qualified immunity.

Defendants have not challenged plaintiffs' claims against Isrig for violations of the Eighth Amendment by the infliction of cruel and unusual punishment.

## V. CLAIMS REMAINING FOR LITIGATION

The claims of plaintiffs that remain for litigation are:

    (a)    Plaintiff Victoria Whittington's claims

(1)    Count 1 -- against defendant Isgrig for violation of the Eighth Amendment's prohibition against Cruel and Unusual Punishment;

(2)    Count 2 -- against defendant Isgrig alleging the Missouri common law tort of outrageous conduct;

    (b)    Plaintiff Maegen Bright's claims

(3)    Count 8 -- against defendant Isgrig for violation of the Eighth Amendment's prohibition against Cruel and Unusual Punishment;

(4) Count 9 -- against defendant Isgrig alleging the Missouri common law tort of outrageous conduct;

        (c) Plaintiff Sondra Loness' claims

(5) Count 16 -- against defendant Isgrig for violation of the Eighth Amendment's prohibition against Cruel and Unusual Punishment;

(6) Count 17 -- against defendant Isgrig alleging the Missouri common law tort of outrageous conduct.

## VI.  CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motion of defendant Mark Isgrig for summary judgment against plaintiffs Victoria Whittington, Maegen Bright, and Sondra Loness (Doc. 93) is sustained in part and denied in part.

**IT IS FURTHER ORDERED** that the motion of defendants George Lombardi and Angela Mesmer for summary judgment against plaintiffs Victoria Whittington, Maegen Bright, and Sondra Loness (Doc 95) is sustained.  Plaintiffs' claims against defendants Lombardi and Mesmer are dismissed with prejudice.

**IT IS FURTHER ORDERED** that the final pretrial conference is set for Tuesday, July 7, 2015 at 2:00 p.m. in St. Louis.  Pretrial compliance documents are to be filed on or before June 22, 2015.

**IT IS FURTHER ORDERED** that this case is set for a jury trial in Hannibal, Missouri, on **Monday, July 13, 2015, at 9:00 a.m**.  Trial is expected to last 2-3 days.

        /S/   David D. Noce
        **UNITED STATES MAGISTRATE JUDGE**

Signed on May 20, 2015.